[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-10602

_____

D.C. Docket No. 2:12-cv-00138-RWS

RICHARD M. VILLARREAL,
on behalf of himself and all others similarly situated,

Plaintiff - Appellant,

versus

R.J. REYNOLDS TOBACCO COMPANY,
PINSTRIPE, INC.,

Defendants - Appellees,

CAREERBUILDER, LLC,

Defendant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(November 30, 2015)

Before WILSON and MARTIN, Circuit Judges, and VINSON,[*] District Judge.

MARTIN, Circuit Judge:

Richard Villarreal appeals the District Court's dismissal of his Age Discrimination in Employment Act (ADEA) lawsuit. He alleges that RJ Reynolds Tobacco Company discriminated against him on the basis of age when it rejected his application for employment. This appeal raises two important questions. The first is a question of first impression in this Circuit: whether § 4(a)(2) of the ADEA, 29 U.S.C. § 623(a)(2), authorizes disparate impact claims by applicants for employment. We hold that it does, though not because the language of the statute plainly requires this reading. In fact, the statute is unclear on this question. However, the Equal Employment Opportunity Commission (EEOC), the agency charged with enforcing the ADEA, has reasonably and consistently interpreted the statute to cover claims like Mr. Villarreal's. We must defer to that reading rather than venture our own guess about what the statute means. The second question is whether Mr. Villarreal is entitled to equitable tolling of the ADEA's limitations period. We conclude that he is, and reverse the judgment of the District Court for both of these reasons.

---

[*] Honorable C. Roger Vinson, United States District Judge for the Northern District of Florida, sitting by designation.

I.

RJ Reynolds employs regional sales representatives known as Territory Managers.  With the assistance of recruiting services, the company used a set of "resume review guidelines" in screening applicants for these positions.  These guidelines list a number of characteristics RJ Reynolds wanted in its new hires, some of which relate to age.  For example, the guidelines tell hiring managers to target candidates who are "2–3 years out of college" but to "stay away from" candidates with "8–10 years" of prior sales experience.  As it turns out, RJ Reynolds's hiring statistics suggest a pattern of hiring younger applicants.  Of the 1,024 people hired as Territory Managers from September 2007 to July 2010, only 19 were over the age of 40.

Mr. Villarreal first applied for a Territory Manager position in November 2007 by submitting an online application.  He was 49 years old at the time.  RJ Reynolds never responded to his application.  Over two years later, on May 17, 2010, Mr. Villarreal filed a charge of unlawful discrimination with the Equal Employment Opportunity Commission (EEOC), alleging that RJ Reynolds had discriminated against him on the basis of his age.  The timing of this charge is relevant to Mr. Villarreal's federal lawsuit because the ADEA requires a person to

3

file a charge of discrimination within 180 days of the discriminatory act.[1]  29

U.S.C. § 626(d)(1)(A).  Compliance with this 180-day limitations period is a

"prerequisite" to bringing a federal suit.  McClinton v. Ala. By-Prods. Corp., 743

F.2d 1483, 1485 (11th Cir. 1984).

While his charge of discrimination was pending before the EEOC, Mr.

Villarreal applied for a Territory Manager position five more times, and was

rejected each time.  He amended his charge of discrimination to add these

applications and rejections.  Finally, on April 2, 2012, the EEOC declined to take

further action against RJ Reynolds, and issued Mr. Villarreal a right-to-sue notice.

Mr. Villarreal next filed this lawsuit, raising both disparate treatment

(discriminatory intent) and disparate impact (discriminatory result) claims under

the ADEA on behalf of himself and all other similarly situated applicants.  The

complaint acknowledged that Mr. Villarreal's charge of discrimination had been

filed more than 180 days after his initial November 2007 application.  However,

Mr. Villarreal says the limitations period should be equitably tolled until April

2010 because "[t]he facts necessary to support [his] charge of discrimination were

not apparent to him, and could not have been apparent to him, until less than a

month before he filed his May 17, 2010 EEOC charge."

---

[1] The limitations period is extended to 300 days if there exists a state agency equivalent to the EEOC.  Jones v. Dillard's, Inc., 331 F.3d 1259, 1263 (11th Cir. 2003) (citing 29 U.S.C. §§ 626(d), 633).  Georgia does not have such an agency, so the 180-day period applies here.

4

The District Court granted RJ Reynolds's partial motion to dismiss.  First, it dismissed Mr. Villarreal's disparate impact claim entirely, finding that the ADEA only allows suits for disparate impact claims brought by current employees, as opposed to applicants for employment like Mr. Villarreal.  Second, it dismissed all claims related to hiring decisions before November 19, 2009, as untimely.[2]  The District Court found that Mr. Villarreal was not entitled to equitable tolling for his November 2007 allegations because "[t]he Complaint does not specify which facts Plaintiff came to know in 2010, or how Plaintiff came to know them."

Following the District Court's ruling, Mr. Villarreal moved to amend his complaint to add facts in support of his equitable tolling argument.  Mr. Villarreal's proposed amended complaint alleged that he had not known about RJ Reynolds's process for reviewing applications or its use of the resume review guidelines until he spoke with lawyers from Altshuler Berzon in April 2010.  Indeed, RJ Reynolds never responded one way or the other to Mr. Villarreal's 2007 application, so "[h]e did not even know whether his application had been reviewed at all, much less whether it had been rejected or screened out."

The District Court found that the amendment would be futile and denied Mr. Villarreal leave to amend his complaint.  It explained that Mr. Villarreal's

---

[2] November 19, 2009, is 180 days before Mr. Villarreal filed his charge of discrimination with the EEOC.  The District Court's timeliness ruling applied to all plaintiffs in the collective action.  See Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d 1208, 1214 (11th Cir. 2001) (per curiam).

amended complaint had not stated a claim for equitable tolling for two reasons. First, Mr. Villarreal did not diligently pursue his rights because he did not contact RJ Reynolds to find out why his application had been rejected. And second, he failed to allege any misrepresentation or concealment by RJ Reynolds.

Mr. Villarreal voluntarily dismissed his remaining claim and filed this appeal, challenging the District Court's rulings on both his disparate impact claim and equitable tolling. We consider each argument in turn.

II.

We first address whether § 4(a) of the ADEA authorizes disparate impact claims by people applying for jobs. Unlawful discrimination takes two forms: disparate treatment and disparate impact. In the employment context, disparate treatment happens when an employer treats some people less favorably because of a protected characteristic, such as race, religion, sex, or in our case, age. To prove this type of claim, a plaintiff must establish that the employer had the intent to discriminate. Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n.15, 97 S. Ct. 1843, 1854 n.15 (1977). In contrast, disparate impact happens when an employer uses "practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another." Id. No proof of discriminatory intent is required for disparate impact claims. Id.

In Smith v. City of Jackson, Miss., 544 U.S. 228, 125 S. Ct. 1536 (2005), the

6

Supreme Court held for the first time that the ADEA authorizes disparate impact claims. Smith was a case in which older employees had received smaller salary increases than their younger colleagues. Id. at 230, 125 S. Ct. at 1539. Because Smith involved only claims of current employees, it did not answer the question we face here: whether job applicants may bring disparate impact claims as well.

A.

As always, statutory interpretation begins with the language of the statute. If the statutory language is clear, then our inquiry ends. King v. Burwell, __ U.S. __, __, 135 S. Ct. 2480, 2489 (2015). If the language is unclear, we see if the agency that enforces the statute has interpreted the ambiguity. If the agency has interpreted the ambiguity reasonably, then we defer to its view. See id.

> Section 4(a) of the ADEA makes it unlawful for an employer:
>
> (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age; [or]
>
> (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age

29 U.S.C. § 623(a). Smith noted "key textual differences" between these two provisions. Smith, 544 U.S. at 236 n.6, 125 S. Ct. at 1542 n.6 (plurality opinion). First, the two provisions treat motive differently. Subsection (a)(1) makes it

7

unlawful to "discriminate against any individual . . . because of such individual's age." This provision focuses on the employer's (discriminatory) motives, and is the part of § 4(a) that authorizes disparate treatment claims. See Smith, 544 U.S. at 236, 125 S. Ct. at 1542. Subsection (a)(2) targets employer conduct that "would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee." This provision "focuses on the effects of the action on the employee rather than the motivation for the action of the employer," so it is the part of § 4(a) that authorizes disparate impact claims. Id. Smith identified only this difference between the two sections of the statute. See id. at 236 & n.6, 125 S. Ct. at 1542 & n.6.

However another possible difference is the description of who can sue under each section. Both subsections use the term "any individual." But they use it in different contexts. Subsection (4)(a)(1) makes it unlawful "to fail or refuse to hire or to discharge any individual." The verb "hire" makes clear that "any individual" includes job applicants. But § 4(a)(1) does not authorize disparate impact claims, so Mr. Villarreal's argument is based on § 4(a)(2). Subsection 4(a)(2) also refers to "any individual." Again, this section makes it unlawful for an employer "to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities." This section targets exactly three categories of conduct: an employer's actions that "limit, segregate, or

8

classify his employees." Within those three categories, the liability sweeps wide: any action that "would deprive or tend to deprive any individual of employment opportunities." This is the very phrase that authorizes disparate impact liability, and the object of these verbs is the expansive term "any individual."

This language has provoked the disagreement before us. Mr. Villarreal reads § 4(a)(2) to plainly cover his allegations. He notes that § 4(a)(2) makes it unlawful for an employer "to limit . . . his employees in any way which would deprive or tend to deprive any individual of employment opportunities . . . because of such individual's age." 29 U.S.C. § 623(a)(2). He says RJ Reynolds "limited" its "employees" in a "way which would deprive or tend to deprive" an "individual" like him "of employment opportunities" because of his age. RJ Reynolds, in turn, directs us to the earlier term "his employees." It says the later reference to "any individual" only includes these employees. RJ Reynolds reads § 4(a)(2) to cover only things a company does to "limit, segregate, or classify" its employees in a way that would deprive those employees of employment opportunities.

Both of these readings seem reasonable. That being the case, the plain language of the statute does not make clear whether job applicants like Mr. Villarreal may bring disparate impact claims. But before analyzing whether we can defer to the agency's reading, we take stock of a few other arguments for each interpretation. These arguments underscore that § 4(a)(2) can reasonably be read

in more than one way.

1.

In support of his reading, Mr. Villarreal points to the landmark decision Griggs v. Duke Power Co., 401 U.S. 424, 91 S. Ct. 849 (1971).  In Griggs the Supreme Court unanimously held that the plain text of § 703(a)(2) of Title VII of the Civil Rights Act of 1964 authorized disparate impact liability.  The language interpreted in Griggs was identical to the language of § 4(a)(2) except that it addressed discrimination based on "an individual's race, color, age, religion, sex, or nationality" rather than "an individual's age."

When the Supreme Court held in Smith that the plain text of § 4(a)(2) of the ADEA also authorized disparate impact liability, its analysis started with Griggs.  The Court framed the question before it as "whether the 'disparate-impact' theory of recovery announced in Griggs . . . is cognizable under the ADEA."  544 U.S. at 230, 125 S. Ct. at 1539.  And the Court's answer to this question "beg[a]n with the premise that when Congress uses the same language in two statutes having similar purposes, particularly when one is enacted shortly after the other, it is appropriate to presume that Congress intended that text to have the same meaning in both statutes."  Id. at 233, 125 S. Ct. at 1541 (plurality opinion).

As we noted, Smith involved disparate impact claims brought only by current employees.  In Griggs, it is not as clear who won relief.  Griggs began as a

10

class action brought by current employees of a power plant on behalf of "employees who subsequently may be employed at the [plant] . . . and all [African Americans] who may hereafter seek employment." Griggs v. Duke Power Co., 420 F.2d 1225, 1227 (4th Cir. 1970). Though the Supreme Court noted that the case was a class action, the Court also called the petitioners "a group of incumbent [African American] employees" and stated that "[a]ll the petitioners are employed at the Company's Dan River Steam Station." 401 U.S. at 426, 91 S. Ct. at 851. But the Court also considered whether the parallel Title VII language prohibited requirements that are imposed "as a condition of employment in or transfer to jobs" and "operate to disqualify [African Americans] at a substantially higher rate than white applicants." Id. (emphasis added). We also know that the Supreme Court has continued to characterize Griggs as protecting "applicants for hire." See Dothard v. Rawlinson, 433 U.S. 321, 328–29, 97 S. Ct. 2720, 2726–27 (1977). Just this summer, the Court said Griggs applied disparate impact liability to "hiring criteria." See Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys Project, Inc., __ U.S. __, __, 135 S. Ct. 2507, 2517 (2015).[3]

---

[3] Our Court has also characterized Griggs in this way. See EEOC v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1279 n.16 (11th Cir. 2000) ("In Griggs . . . the plaintiffs showed that the objective and facially neutral requirements . . . in order to be hired or transferred . . . had a disproportionate effect on white and black applicants."); id. at 1282 n.18 (reading Griggs to apply to "neutral hiring and promotion practices"); Johnson v. Goodyear Tire & Rubber Co., Synthetic Rubber Plant, 491 F.2d 1364, 1371–72 & n.17, 1373 & n.25 (5th Cir. 1974) (interpreting and applying Griggs as permitting disparate impact hiring claims brought by

Mr. Villarreal argues that Griggs requires us to adopt his reading of

§ 4(a)(2).  RJ Reynolds responds that all the references in Griggs to "applicants"

and "hiring" concerned current employees seeking promotions or transfers, not job

applicants.  Either way, Griggs did not directly tell us whether the identical Title

VII language covers job applicants.  Neither has the Court had a chance to address

this question since.   That is because the year after the Griggs decision, Congress

changed the relevant language of Title VII from "his employees" to "his

employees or applicants for employment."  42 U.S.C. § 2000e-2(a)(2).  We know

that Griggs did not decide whether Title VII applies to job applicants, so it does not

require us to adopt Mr. Villarreal's reading of § 4(a)(2).  That said, the Supreme

Court's repeated references to job applicants and its continued characterization of

Griggs as covering job applicants tells us at least that this reading is reasonable.

2.

Title VII relates to the question before us in another way: in 1972, Congress

amended that statute to add the words "or applicants for employment" to the

language that parallels § 4(a)(2) of the ADEA.  See 42 U.S.C. § 2000e-2(a)(2).

Congress has not amended § 4(a)(2) of the ADEA in the same way.  Because

---

"potential . . . employees" and "potential . . . hirees"); United States v. Ga. Power Co., 474 F.2d 906, 911 (5th Cir. 1973) ("In Griggs . . . the Supreme Court held that the proviso of this section means that no test used for hiring or promotion is valid if it 'operates to exclude [African Americans] [and] cannot be shown to be related to job performance.'" (second alteration in original)) (applying Griggs to disparate impact hiring, recruitment, and promotion claims).

Congress chose to change Title VII this way but did not make the same change to the ADEA, the District Court found that § 4(a)(2) cannot cover job applicants. The court quoted language from Gross v. FBL Financial Services, Inc., 557 U.S. 167, 174, 129 S. Ct. 2343, 2349 (2009) saying that the Supreme Court could not "ignore Congress's decision to amend Title VII's relevant provisions but not make similar changes to the ADEA."

Gross involved a 1991 amendment to Title VII as opposed to the 1972 amendment to Title VII. Specifically, the Gross opinion derived two things from the fact that Congress did not amend the ADEA when it enacted the 1991 Title VII amendments. First, the Court noted that in 1991 Congress had "contemporaneously amended the ADEA in several ways." Id. It explained that "negative implications raised by disparate provisions are strongest when the provisions were considered simultaneously when the language raising the implication was inserted." Id. at 175, 129 S. Ct. at 2349 (quotation omitted). But this lesson only goes so far, because we know that Congress did not amend the ADEA in 1972 when it amended Title VII to include "applicants for employment."

Second, the 1991 amendment to Title VII was enacted to override the Supreme Court's interpretation of statutory language. See id. Since Congress was rejecting the Court's interpretation of Title VII, it made sense to assume that Congress knew the Court's interpretation would apply to the ADEA language it

13

left untouched.  But the 1972 amendment was not enacted to reject the Supreme Court's interpretation of the language at issue here.  To the contrary, the Senate Committee on Labor and Public Welfare explained that the change to "[t]his subsection would merely be declaratory of present law."  S. Rep. No. 92-415, at 43 (1971).  And the parallel House Report explained the change by quoting extensively from Griggs and declaring that "[t]he provisions of the bill are fully in accord with the decision" in Griggs.  H.R. Rep. No. 92-238, at 21–22 (1971).

Congress has all kinds of reasons for passing laws, and presumably all kinds of reasons for not passing laws as well.  The 1972 change to Title VII was part of a broad revamp of the statute aimed at expanding the jurisdiction and power of the EEOC.  See George P. Sape & Thomas J. Hart, Title VII Reconsidered: The Equal Opportunity Act of 1972, 40 Geo. Wash. L. Rev. 824 (1972).  When Congress undertook these changes the ADEA was administered by the Secretary of Labor, not the EEOC.  See 42 U.S.C.A. § 2000e-4 (1978).  We will not assume that Congress chose not to pass legislation modifying the ADEA simply because it did make this one change in a broader restructuring of Title VII.

3.

RJ Reynolds asks us to treat Smith in much the same way Mr. Villarreal asks us to treat Griggs.  But as we've said, Smith did not involve disparate impact claims by job applicants.  Neither did the Smith plaintiffs (like the Griggs

14

plaintiffs) challenge policies that harmed both job applicants and current employees. While we recognize that the two concurring opinions in Smith referenced the fact that § 4(a)(2) does not expressly mention job applicants,[4] it is also true that the issue of whether applicants can bring disparate impact claims was neither argued by the parties nor relevant to the case. At most, the dicta in Smith's concurrences, like that in Griggs, tells us that RJ Reynolds offers one reasonable

---

[4] Justice O'Connor noted that "[s]ection 4(a)(2), of course, does not apply to 'applicants for employment' at all—it is only § 4(a)(1) that protects this group." 544 U.S. at 266, 125 S. Ct. at 1559 (O'Connor, J., concurring). Justice Scalia responded by noting that "perhaps the agency's attempt to sweep employment applications into the disparate-impact prohibition is mistaken." Id. at 246 n.3, 125 S. Ct. at 1548 n.3 (Scalia, J., concurring).

The dissent suggests that other Justices in Smith endorsed Justice O'Connor's dicta because "nobody disagreed with her." The dissent then quotes our observation that "there is dicta, and then there is Supreme Court dicta." Schwab v. Crosby, 451 F.3d 1308, 1325 (11th Cir. 2006). Along the same lines: there is dicta in a binding opinion and there is dicta in a nonbinding concurrence. It's one thing to abide by dicta that is "three long, citation-laden paragraphs" of "well thought out, thoroughly reasoned, and carefully articulated analysis" in a majority opinion, as Schwab did. Id. It's another to do the same for a single sentence in a minority opinion, via the assumption that other Justices implicitly approved of this sentence.

As for the Smith plurality, the dissent points to a footnote in this opinion comparing § 4(a)(1)'s focus on an employer's motives to § 4(a)(2)'s focus on the effects of an employer's actions. The dissent quotes a passage from this footnote that explains how § 4(a)(2) operates for claims brought by current employees. But this passage doesn't exclude § 4(a)(2) from applying to other kinds of claims. The Court was simply explaining how the statute works for claims like the ones then before them. And the plurality even cited cases brought by job applicants to declare that "for over two decades after our decision in Griggs, the Courts of Appeals uniformly interpreted the ADEA as authorizing recovery on a 'disparate-impact' theory in appropriate cases." 544 U.S. at 236–37 & n.8, 125 S. Ct. at 1542–43 & n.8 (citing Wooden v. Bd. of Educ. of Jefferson Cty., 931 F.2d 376 (6th Cir. 1991), and Faulkner v. Super Valu Stores, Inc., 3 F.3d 1419 (10th Cir. 1993)).

reading of § 4(a)(2).[5]  Notably, none of the opinions in Smith analyzed whether the EEOC deserves deference for its view on this particular question, as we must in the case before us.

4.

RJ Reynolds also presses the argument that the meaning of § 4(a)(2) can be clearly derived from the way other parts of the ADEA distinguish between employees and applicants for employment.  For example, section 4(c)(2) makes it unlawful for a labor organization to "limit, segregate, or classify its membership" in any way that "adversely affect[s] [an individual's] status as an employee or as an applicant for employment."  29 U.S.C. § 623(c)(2).  Section 4(d) extends the ADEA's retaliation protections to "applicants for employment" and "applicant[s] for membership" in a labor organization.  Id. § 631(d).  And section 12(b) describes age limits for "any personnel action affecting employees or applicants for employment."  Id. § 631(b).  Finally, section 15 describes protections for "employees or applicants for employment," "employees and applicants for employment," and "an employee or applicant for employment."  Id. §§ 633(a)–(b).

---

[5] As for the dicta from other circuits that the dissent cites, the first of these cases distinguished the ADEA from Title VII by explaining that "the basis for the Supreme Court's holding in Griggs" was Title VII's reference to "employees or applicants."  E.E.O.C. v. Francis W. Parker Sch., 41 F.3d 1073, 1077 (7th Cir. 1994).  As discussed above, this language was added to Title VII after Griggs.  The two other cases cited by the dissent both relied on Francis W. Parker.  This is the problem with dicta: when an issue is superfluous, even obvious errors escape notice.

RJ Reynolds tells us these provisions show that Congress knew how to reference job applicants and intentionally chose not to in § 4(a)(2).

But in contrast to § (4)(a)(1) and these other provisions referenced by RJ Reynolds, § 4(a)(2) does not reference applicants for employment, and uses the general term "any individual."[6] We know that "'any' is a powerful and broad word. It does not mean some or all but a few, but instead means all." United States v. Fleet, 498 F.3d 1225, 1229 (11th Cir. 2007). Still, we cannot ignore that Congress expressly protected applicants for employment in other provisions of the ADEA but declined to do so in § 4(a)(2). After all, "Congress generally acts intentionally when it uses particular language in one section of a statute but omits it in another." Dep't of Homeland Sec. v. MacLean, __ U.S. __, __, 135 S. Ct. 913, 919 (2015). And this "interpretive canon . . . applies with particular force" when Congress uses an omitted phrase elsewhere in "close proximity." Id.

That said, this interpretive canon does little to reveal whether Congress used

---

[6] At least some of the specific references to job applicants or hiring in other provisions may be explainable. For example, Mr. Villarreal argues that the prohibition on labor union practices that harm an individual's "status as an employee or as an applicant for employment" is meant to address the unique way that certain unions influence someone's "status" as a job applicant specifically by referring employers to applicants through union hiring halls. True or not, this point underscores the danger of trying to guess why Congress chose broad or ambiguous terms based on guesses about why it chose specific terms on other occasions. For this reason, the "presumption" of uniform usage "is not rigid and readily yields whenever there is such variation in the connection in which the words are used as reasonably to warrant the conclusion that they were employed in different parts of the act with different intent." Gen. Dynamics Land Sys., Inc. v. Cline, 540 U.S. 581, 595, 124 S. Ct. 1236, 1245 (2004) (holding that the word "age" has different meanings in different parts of the ADEA).

17

the term "any individual" to exclude job applicants or to include them.[7]  Even if

Congress knew how to distinguish employees and applicants, the statute still

prohibits an employer's policies that "limit . . . his employees in any way which

would deprive or tend to deprive any individual of employment opportunities."

Indeed, perhaps these other provisions show that Congress knew how to use the

more specific term "employees" (and used that term in close proximity, earlier in

the same sentence) but chose the broader term "any individual."  Congress could

have made it unlawful for an employer "to limit, segregate, or classify his

employees in any way which would deprive or tend to deprive any employee of

employment opportunities."  Instead it said "any individual."

5.

Finally, Mr. Villarreal and amici urge us to construe § 4(a)(2) to permit

disparate impact claims from job applicants because this would fit the ADEA's

general purpose of protecting older job applicants.  Congress's concern for older

job applicants was evident in a report written by the Department of Labor that led

Congress to enact the ADEA.  See U.S. Dep't of Labor, The Older American

Worker: Age Discrimination in Employment (1965).  This report specifically

---

[7] In addition, the next subsection of the statute uses the term "any individual" to refer solely to job applicants.  See 29 U.S.C. § 623(b).  This section makes it "unlawful for an employment agency to fail or refuse to refer for employment, or otherwise to discriminate against, any individual."  Id. (emphasis added).  The ADEA's definition section later explains that employment agencies solely work with applicants for employments.  See id. § 630(c).

described how seemingly neutral employment practices – including practices like the screening guidelines challenged by Mr. Villarreal – can impose a disparate burden on older job applicants. See id. at 3 ("Any formal employment standard which requires, for example, a high school diploma will obviously work against the employment of many older workers."); see also id. at 12 ("Even for many plant production jobs in the major industries, employers for a variety of reasons seek young workers with high school educations or equivalent vocational training."). In this way the report seemed to predict the disparate impact idea that Griggs made law seven years later. The report further analyzed the discriminatory effects of "institutional arrangements that indirectly restrict the employment of older workers," id. at 15, as well as "employment practices which quite unintentionally lead to age limits in hiring," id. at 22.

The report proposed legislation which was ultimately enacted as the ADEA. The ADEA clearly states that one of its purposes is to "promote [the] employment of older persons based on their ability rather than age." 29 U.S.C. § 621(b). It also declares that "older workers find themselves disadvantaged in their efforts . . . especially to regain employment when displaced from jobs" and that "the incidence of unemployment, especially long-term unemployment . . . is, relative to the younger ages, high among older workers; their numbers are great and growing; and their employment problems grave." 29 U.S.C. § 621(a).

19

Mr. Villarreal relies on these statements to argue that Congress intended for § 4(a)(2) to protect both current employees and prospective job applicants.[8] We agree that these statements show that Congress enacted the ADEA to address discriminatory hiring. But neither these statements of purpose nor the statute's legislative history tell us what type of claim (disparate treatment, disparate impact, or both) an applicant for employment can bring. We decline to answer this question through inferences about the ADEA's general purpose.

*     *     *

Because the text of § 4(a)(2) does not clearly resolve the issue in this case, we ask the question we must when faced with a vague statute: has the agency tasked with enforcing the statute given a reasonable reading?

## B.

Subsection § 4(a)(2) of the ADEA clearly authorizes disparate impact claims. What is less clear is whether its reference to "any individual" includes job applicants, or whether the separate term "his employees" limits the entire provision

---

[8] Meanwhile, RJ Reynolds points to other legislative history suggesting that Congress did not intend § 4(a)(2) to cover job applicants. For example, one legislative document explained that § 4(a)(2) would make it unlawful "[t]o limit, segregate, or classify employees so as to deprive them of employment opportunities or adversely affect their status." 113 Cong. Rec. 31,250 (1967) (emphases added). RJ Reynolds argues that this document proves that Congress did not want § 4(a)(2) to cover job applicants. But then again, maybe this document proves the contrary: maybe it shows that at least one person in or around Congress knew how to unambiguously limit § 4(a)(2) to current employees but Congress itself enacted broader language.

to current employees.  When a statute is ambiguous, policy choices belong to the agency that enforces the statute.  See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 980, 125 S. Ct. 2688, 2699 (2005) ("In Chevron, this Court held that ambiguities in statutes within an agency's jurisdiction to administer are delegations of authority to the agency to fill the statutory gap in reasonable fashion.  Filling these gaps, the Court explained, involves difficult policy choices that agencies are better equipped to make than courts.").

The EEOC enforces the ADEA.  We therefore defer to its views on the ADEA's interpretation and application unless those views are unreasonable.  See Fed. Express Corp. v. Holowecki, 552 U.S. 389, 403, 128 S. Ct. 1147, 1158 (2008) ("Where ambiguities in statutory analysis and application are presented, the agency may choose among reasonable alternatives."); see also EEOC v. Commercial Office Prods. Co., 486 U.S. 107, 115, 108 S. Ct. 1666, 1677 (1988) ("[I]t is axiomatic that the EEOC's interpretation of Title VII, for which it has primary enforcement responsibility, need not be the best one by grammatical or any other standards.  Rather, the EEOC's interpretation of ambiguous language need only be reasonable to be entitled to deference.").

The EEOC's current ADEA disparate impact regulation, issued under its statutory rulemaking authority, 29 U.S.C. § 628, does not distinguish between prospective and existing employees.  Instead, it states that, "[a]ny employment

21

practice that adversely affects individuals within the protected age group on the basis of older age is discriminatory unless the practice is justified by a 'reasonable factor other than age.'"  29 C.F.R. § 1625.7(c).  The regulation extends disparate impact liability to all "individuals within the protected age group."  The EEOC argues that the regulation therefore established the agency's view that § 4(a)(2) protects any individual an employer discriminates against, regardless of whether that individual is an employee or job applicant.  Chevron requires us to defer to this regulation's reasonable interpretation of the ADEA's "standards for a disparate-impact claim."  Smith, 544 U.S. at 240, 125 S. Ct. at 1544 (plurality opinion).  See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 844, 104 S. Ct. 2778, 2782 (1984).

RJ Reynolds responds with two arguments for why the EEOC's construction is not entitled to deference.  First, the company claims 29 C.F.R. § 1625.7 is not relevant to this case because it interprets a separate provision of the ADEA. Second, it argues that the regulation does not clearly address the question in this case.  We address each of these arguments in turn.  In doing so, we are mindful that even if we assume that 29 C.F.R. § 1625.7 is ambiguous by virtue of an inferred limitation on its broad phrase "individuals within the protected age group," we still owe deference to the EEOC's view because the agency has reasonably and consistently insisted on this view for decades.

22

1.

RJ Reynolds argues that 29 C.F.R. § 1625.7 is not entitled to deference on the question of whether § 4(a)(2) permits disparate impact liability for applicants because this regulation concerns a separate provision of the ADEA. The company argues that 29 C.F.R. §1625.7 merely applies the "reasonable factor other than age" (RFOA) defense from Section 4(f)(1) to ADEA liability, rather than providing a basis for disparate impact liability, which comes from § 4(a)(2).

But we read Smith to foreclose this argument. Because the Smith plurality found that the text of § 4(a)(2) plainly authorizes disparate impact liability, it was not necessary for a majority of Justices to analyze whether and how courts must defer to the EEOC's disparate impact regulation. The plurality did reference this regulation to explain why the RFOA provision cannot be understood separate from the statutory scheme as a whole. See 544 U.S. at 239–40, 125 S. Ct. at 1544 (plurality opinion). The plurality also explained that EEOC has "consistently interpreted the ADEA to authorize relief on a disparate-impact theory" and that 29 C.F.R. § 1625.7 "set[s] forth the standards for a disparate-impact claim." Id.

Justice Scalia joined the Court's holding that the ADEA permits disparate impact liability, but he reached his view by way of deference to 29 CFR § 1625.7. He first explained why 29 CFR § 1625.7 deserves deference as an interpretation of § 4(a)(2):

As [the] text [of § 4(f)(1)] makes clear, the RFOA defense is relevant only as a response to employer actions "otherwise prohibited" by the ADEA. Hence, the unavoidable meaning of the regulation at issue is that the ADEA prohibits employer actions that have an "adverse impact on individuals within the protected age group." 29 CFR § 1625.7(d) (2004). And, of course, the only provision of the ADEA that could conceivably be interpreted to effect such a prohibition is § 4(a)(2).

Id. at 246, 125 S. Ct. at 1548 (Scalia, J., concurring). Justice Scalia then specified why the regulation's interpretation of "otherwise prohibited" deserved deference, even though the regulation was focused on interpreting the term "reasonable factors other than age." In doing so, he responded to Justice O'Connor's view:

Justice O'Connor . . . argues that the EEOC's interpretation of what is "otherwise prohibited" by the ADEA is not entitled to deference because the Court concludes that the same regulation's interpretation of another term . . . is unreasonable. Her logic seems to be that, because the two interpretations appear in the same paragraph, they should stand or fall together. She cites no case for this proposition, and it makes little sense. If the two simultaneously adopted interpretations were contained in distinct paragraphs, the invalidation of one would not, of course, render the other infirm. . . . I can conceive no basis for a different rule simply because the two simultaneously adopted interpretations appear in the same paragraph.

Id.

Although Smith addressed a slightly different question than we have here, our study of it causes us to reject RJ Reynolds's argument "that the RFOA clause operates independently of the remainder of the ADEA." Id. at 245, 125 S. Ct. at 1548. Although 29 CFR § 1625.7 is primarily analyzing "reasonable factor other than age" not "any individual," we "can conceive no basis" to ignore the regulation's broad and unambiguous interpretation of this latter term "simply

24

because the two simultaneously adopted interpretations appear in the same paragraph." Id. at 247, 125 S. Ct. at 1549. Smith establishes that 29 CFR § 1625.7 "set[s] forth the standards for a disparate-impact claim." Id. at 240, 125 S. Ct. at 1544 (plurality opinion). We owe deference to these standards to the extent they are reasonable, and they are.

2.

RJ Reynolds also argues that 29 C.F.R. § 1625.7 is not entitled to deference on the question of whether § 4(a)(2) permits disparate impact liability for applicants because the regulation does not address this question clearly. As we've said, this regulation describes the standard for challenging an "employment practice that adversely affects individuals within the protected age group." 29 C.F.R. § 1625.7(c). RJ Reynolds claims the expansive term "individuals" is ambiguous as to the question in this case.

However, the preamble to the final regulations makes clear that the term "individuals" covers both employees and applicants. The preamble gives a number of examples of cases involving job applicants. See 77 Fed. Reg. 19080, 19084 (2012) (describing a test for "candidates for jobs"); id. at 19086 (describing a test for "applicants for security guard positions"); id. at 19087 (describing how "an employer seeking to hire individuals with technological skills could instruct decision makers" in a way that can "help to overcome age-based stereotypes").

The preamble's list of "benefits of the rule" then declares that the regulation will address "neutral practices that act as barriers to the employment of older workers":

> Data show that older individuals who become unemployed have more difficulty finding a new position and tend to stay unemployed longer than younger individuals. To the extent that the difficulty in finding new work is attributable to neutral practices that act as barriers to the employment of older workers, the regulation should help to reduce the rate of their unemployment and, thus, help to reduce these unique burdens on society.

Id. at 19092 (footnote omitted). The EEOC's interpretation is "a reasonable extrapolation of its regulations" and we defer to it "in light of its experience and expertise in protecting those covered by the Act." Holowecki, 552 U.S. at 398, 128 S. Ct. at 1158; see also Auer v. Robbins, 519 U.S. 452, 461, 117 S. Ct. 905, 911 (1997) (finding agency's interpretation of its own regulations is controlling "unless plainly erroneous or inconsistent with the regulation" (quotation omitted)).[9]

---

[9] RJ Reynolds argues we should not defer to the EEOC's view that § 4(a)(2) covers job applicants because the EEOC's disparate impact regulation "parrots" an ambiguous statutory term. See Gonzales v. Oregon, 546 U.S. 243, 257, 126 S. Ct. 904, 916 (2006) ("An agency does not acquire special authority to interpret its own words when . . . it has elected merely to paraphrase the statutory language.").

We reject this argument for two reasons. First, the regulation in Holowecki also used the same "term Congress used in the underlying statute." Holowecki, 552 U.S at 398, 128 S. Ct. at 1156. But the Court distinguished Gonzales by noting that the EEOC had consistently and reasonably advanced the same view for years. See id. at 399, 128 S. Ct. at 1156. As we discuss in section II.B.3, the EEOC has done the same here, so its view is "entitled to a 'measure of respect' under the less deferential Skidmore standard." Id.

Second, the Gonzales regulation parroted the statutory terms "course of professional practice" and "legitimate medical purpose." Gonzales, 546 U.S. at 257, 126 S. Ct. at 916. These

3.

Finally, there is another reason to defer to the EEOC's view on the scope of disparate impact liability under the ADEA. Days after the ADEA went into effect, the Department of Labor, which initially enforced the statute, clarified that neutral "pre-employment" tests must be "reasonably necessary for the specific work to be performed" and "equally applied to all applicants." 33 Fed. Reg. 9173 (1968).[10] And, in 1981, once the EEOC took over enforcing the statute, it made its view on the scope of disparate impact liability clear in a regulation issued though notice-and-comment rulemaking:

> When an employment practice, including a test, is claimed as a basis for different treatment of employees or applicants for employment on the grounds that it is a "factor other than" age, and such a practice has an adverse impact on individuals within the protected age group, it can only be

---

two terms did not clearly answer the question in the case. In contrast, RJ Reynolds does not claim here that the statutory term "any individual" is by itself unclear. Instead, the company argues this term should be limited by the separate term "his employees." The regulation imposes no such limitation. It simply prohibits "[a]ny employment practice that adversely affects individuals within the protected age group on the basis of older age." For this reason, the text of the regulation lacks the ambiguity in the statute. So, even if we were to assume that the regulation was somehow still ambiguous, Auer requires us to defer to the EEOC's clarification of this ambiguity. See Holowecki, 552 U.S at 398–99, 128 S. Ct. at 1156.

[10] Indeed, the EEOC first advanced this construction before the ADEA was even passed into law, as an interpretation of the identical Title VII language: in 1966, the agency issued Guidelines on Employment Testing Procedures which required that employment testing "fairly measures the knowledge or skills required by the particular job or class of jobs which the applicant seeks, or which fairly affords the employer a chance to measure the applicant's ability." Griggs, 401 U.S. at 433 n.9, 91 S. Ct. at 855 n.9 (quoting EEOC guidelines) (emphasis added). Because these guidelines form part of "the background against which Congress enacted" the ADEA, they are a clue into Congress's intent in using the same language in the ADEA. FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 147, 120 S. Ct. 1291, 1308 (2000).

justified as a business necessity.

29 C.F.R. § 1625.7(d) (1981).  This 1981 "regulation affirmed . . . the longstanding position of the Department of Labor, the agency that previously administered the ADEA."  Smith, 544 U.S. at 244, 125 S. Ct. at 1547 (Scalia, J., concurring) (referencing both the text of 29 C.F.R. § 1625.7 and the "statement of the EEOC which accompanied publication of the agency's final interpretation"); see also id. at 239–40, 125 S. Ct. at 1544 (plurality opinion) (defending its interpretation of the ADEA with the fact that "both the Department of Labor, which initially drafted the legislation, and the EEOC, which is the agency charged by Congress with responsibility for implementing the statute, have consistently" pushed the same interpretation (citation omitted)).

The EEOC also stated this view in litigation as early as a 1995 brief before the Supreme Court.[11]  And the EEOC now advances this same interpretation in the

---

[11] See Petition for a Writ of Certiorari at 12–13, EEOC v. Francis W. Parker Sch., 515 U.S. 1142, 115 S. Ct. 25 (1995) (No. 94-1558), 1995 WL 17047545 ("The court of appeals . . . reasoned that . . . Section 4(a)(2) protects only incumbent employees.  That reasoning is seriously flawed.  By its express terms, Section 4(a)(2) is not limited to protecting incumbent employees.  Although Section 4(a)(2) makes it unlawful for an employer 'to limit, segregate, or classify his employees,' the employer may not engage in such conduct 'in any way which would deprive or tend to deprive any individual of employment opportunities.' . . .  The use of the term 'individual' rather than 'employee' indicates that Section 4(a)(2) protects applicants for employment."); see also Brief of the Equal Employment Opportunity Commission as Appellee at n.2, EEOC v. Allstate Ins. Co., 528 F.3d 1042 (8th Cir. 2008) (No. 07-1559), 2007 WL 6604487 (8th Cir. 2007).

RJ Reynolds claims the EEOC's litigation positions are not consistent because an earlier EEOC brief filed while the Francis W. Parker School case was in the Seventh Circuit stated that

amicus brief filed in this case.  "Under Auer v. Robbins, we defer to an agency's

interpretation of its own regulation, advanced in a legal brief, unless that

interpretation is 'plainly erroneous or inconsistent with the regulation.'"  Chase

Bank USA, N.A. v. McCoy, 562 U.S. 195, 208, 131 S. Ct. 871, 880 (2011)

(citation omitted).  Here "there is no reason to suspect that the position the [EEOC]

takes in its amicus brief reflects anything g other than the agency's fair and

considered judgment as to what the regulation required at the time this dispute

arose."  Id. at 210, 131 S. Ct. at 881.  The EEOC insisted on this view since at least

1981 and gave the Supreme Court the exact legal reasoning for this view in 1995.

Further, the EEOC's "brief is thoroughly reasoned and demonstrates a high level of

consideration given to the issue; the brief thoroughly and rationally analyzes the

statute, the legislative history, and the policy implications of the statutory

interpretation."  Pugliese v. Pukka Dev., Inc., 550 F.3d 1299, 1305 (11th Cir.

---

"[e]ven if applicants are not covered by subsection 4(a)(2), disparate impact theory applies to them by virtue of subsection 4(a)(1)."  EEOC Reply Brief at 4, EEOC v. Francis W. Parker Sch., 41 F.3d 1073 (7th Cir. 1994) (No. 93-3395), 1994 WL 16045193.  This alternative basis was later foreclosed by Smith's holding that § 4(a)(2) permits disparate impact but § 4(a)(1) does not.  When the EEOC petitioned for certiorari in Francis Parker School, the agency made the exact same argument about § 4(a)(2) it makes in this case.

RJ Reynolds argues that the two Francis W. Parker School briefs show that the agency was "waffling" in its position on § 4(a)(2).  But the EEOC's Seventh Circuit brief never said that § 4(a)(2) did not apply; it simply said that § 4(a)(1) would apply "even if" § 4(a)(2) did not.  The EEOC offered this alternative argument after noting that the Seventh Circuit "has already interpreted the language of subsection 4(a)(1) to authorize the use of disparate impact in Title VII."  Id.  And when the EEOC sought review of the Seventh Circuit's ruling in the Supreme Court, the agency made the exact argument it now makes before us.

29

2008).  Because "the opinion set forth in the brief is consistent with the position [the EEOC] has always held," we must defer to it.  Id.   We therefore construe §4(a)(2) of the ADEA to apply to disappointed job applicants like Mr. Villarreal.

III.

We turn next to Mr. Villarreal's equitable tolling argument.  At this early stage, Mr. Villarreal is simply required to "plead the applicability of the doctrine." Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1391 (3d Cir. 1994). We accept the complaint's allegations as true and construe them in the light most favorable to Mr. Villarreal.  Harris v. United Auto. Ins. Grp., Inc., 579 F.3d 1227, 1230 (11th Cir. 2009) (per curiam).

Mr. Villarreal's charge of discrimination was filed with the EEOC approximately two-and-a-half years after he first applied for a position with RJ Reynolds.  This is well outside the 180-day limitations period.  29 U.S.C. § 626(d)(1)(a).  However, Mr. Villarreal has alleged that he was entitled to equitable tolling because he did not know—nor could he have known—that he had been discriminated against until April 2010, when he was informed about the resume review guidelines and RJ Reynolds's hiring practices.

The District Court rejected this argument.  It found that Mr. Villarreal was not entitled to equitable tolling because he did not allege either that RJ Reynolds had misrepresented relevant facts or that he had diligently pursued his rights by

30

asking the company why he had not been hired.  On appeal, Mr. Villarreal

contends that the District Court applied the wrong legal standard, and under the

specific facts of his case, those allegations are not required.  We agree.

Forty years ago, our predecessor Circuit first considered this issue in Reeb v.

Economic Opportunity Atlanta, Inc., 516 F.2d 924 (5th Cir. 1975).[12]  Reeb

observed that courts must take special care when considering the timeliness of

employment discrimination claims because an employee may not always have

enough information to file suit within the limitations period.  Id. at 929–31.

Indeed, as it explained, "[s]ecret preferences in hiring and even more subtle means

of illegal discrimination, because of their very nature, are unlikely to be readily

apparent to the individual discriminated against."  Id. at 931.  Thus, the court held

that in employment discrimination cases, the limitations period is equitably tolled

"until the facts which would support a cause of action are apparent or should be

apparent to a person with a reasonably prudent regard for his rights."  Id. at 930.

Since Reeb was decided, we have regularly reaffirmed the "reasonably

prudent" person standard in our ADEA cases.  See, e.g., Jones v. Dillard's, Inc.,

331 F.3d 1259, 1267 (11th Cir. 2003) ("The applicable limitations period did not

begin to run until the facts supporting a cause of action became apparent or should

---

[12] In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.  Id. at 1207.

have became apparent to a reasonably prudent person with concern for his or her rights."); Sturniolo v. Sheaffer, Eaton, Inc., 15 F.3d 1023, 1025 (11th Cir. 1994) ("Under equitable modification, a limitations period does not start to run until the facts which would support a charge of discrimination are apparent or should be apparent to a person with a reasonably prudent regard for his rights."); Cocke v. Merrill Lynch & Co., 817 F.2d 1559, 1561 (11th Cir. 1987) (per curiam) ("Rather, equitable tolling focuses on the employee with a reasonably prudent regard for his rights.").[13]

Three additional aspects of our ADEA equitable tolling standard are important here. First—and contrary to what the District Court found—we do not require misrepresentation by the employer. In fact, we have expressly held to the

---

[13] Although the dissent argues that our precedent requires "a showing of extraordinary circumstances" to warrant equitable tolling, it cites a Social Security Act decision for this proposition. Jackson v. Astrue, 506 F.3d 1349, 1351 (11th Cir. 2007). In Jackson, we refused to apply equitable tolling to excuse a Social Security claimant's untimely appeal of an administrative decision denying her benefits because she had not shown "extraordinary circumstances." See id. at 1353–54 ("We think the law clearly requires that a finding of extraordinary circumstances is necessary before a court may equitably toll the SSA's statutory period, and this determination is reserved for extraordinary facts." (quotation omitted)).

However, we are unaware of any ADEA case that imposes such a requirement. See, e.g., Jones, 331 F.3d at 1263–67 (applying equitable tolling without requiring "extraordinary circumstances"); Hargett v. Valley Fed. Sav. Bank, 60 F.3d 754, 764–65 (11th Cir. 1995) (same); Sturniolo, 15 F.3d at 1024–26 (same); Cocke, 817 F.2d at 1561–62 (same). Applying a less stringent standard in this context makes good sense because discriminatory hiring practices are "unlikely to be readily apparent to the individual discriminated against." Reeb, 516 F.2d at 931. Thus, unlike a Social Security claimant who has all the information necessary to appeal at the time her application for benefits is denied, an employee or applicant for employment may not know any relevant facts at the time of the discriminatory act. See Jones, 331 F.3d at 1264.

contrary.  See, e.g., Browning v. AT&T Paradyne, 120 F.3d 222, 226 (11th Cir. 1997) ("[E]quitable tolling does not require any misconduct on the part of the defendant."); Cocke, 817 F.2d at 1561 ("[E]quitable tolling does not require employer misconduct.").  Rather, we inquire into whether "the facts supporting a cause of action became apparent or should have became apparent to a reasonably prudent person with concern for his or her rights."  Jones, 331 F.3d at 1267.  And based on this inquiry, this Court has allowed equitable tolling in cases where employers concealed or misrepresented facts.  See id. at 1264, 1267; Sturniolo, 15 F.3d at 1025–26.  After all, when evidence of discrimination is deliberately hidden, even a reasonably prudent person would have little opportunity to uncover it.  But there are circumstances other than concealment and misrepresentation which place relevant facts beyond the reach of a reasonably prudent victim of discrimination.  In these cases the ultimate question is not whether an employer deliberately hid facts.  Rather, we ask whether reasonable prudence would have resulted in the plaintiff uncovering hidden facts earlier.

Second, a person's "mere suspicion of age discrimination, unsupported by personal knowledge," does not trigger the limitations period.  Sturniolo, 15 F.3d at 1026.  Instead, the clock does not begin to run until she has enough information to support her cause of action.  Id. at 1025–26.

Finally, because "[s]ecret preferences in hiring" are "unlikely to be readily

33

apparent to the individual discriminated against," Reeb, 516 F.2d at 931, our precedent makes clear that a plaintiff need not undertake an entirely futile investigation into hidden discriminatory practices in the name of "due diligence." Thus, while Mr. Villarreal's diligence may be relevant to the ultimate inquiry—at what point the facts necessary to support his lawsuit "should [have been] apparent to a person with a reasonably prudent regard for his rights," id. at 930—his failure to ask RJ Reynolds why he had not been hired is not fatal to his claim.[14]

Our decision in Jones illustrates this point. In Jones, plaintiff Gerda Byrd worked as an "assistant area sales manager" at a department store. 331 F.3d at 1261. In May 1999, Ms. Byrd learned that the store intended to eliminate her position as part of its restructuring. Id. It allowed her to choose between taking another position or accepting severance pay, and she chose the latter. Id. In June 1999, however, Ms. Byrd learned that the store planned to hire two new assistant area sales managers. Id. She immediately suspected that she had been the victim of age discrimination, and recorded her suspicions in typed notes. Id.

Several months later, in October 1999, the store filled Ms. Byrd's former

---

[14] Along the same lines, the dissent correctly observes that "it might have been somewhat difficult" for Mr. Villarreal to gather facts necessary to establish his discrimination claim since RJ Reynolds used third-party services to screen applicants. But the use of third-party services is not the only difficulty spurned applicants will face. A disappointed applicant inquiring of an employer about the age and identity of whoever was hired in his stead will likely not be well received. Indeed, employers have every incentive to hold this type of information close.

position with a younger applicant.  Id. at 1261–62.  Ms. Byrd learned about the hire

in November 1999 and filed her charge of discrimination with the EEOC in

February 2000.  Id. at 1262–63.  The district court found that Ms. Byrd's federal

lawsuit was untimely because her charge of discrimination had been filed more

than 180 days after any allegedly discriminatory act.  See id. at 1262.

On appeal, our Court considered whether to apply equitable tolling to save

Ms. Byrd's claim.  We observed that the ADEAs limitations period could have

been triggered on three possible dates: (1) April or May 1999, when Ms. Byrd was

first told that her position would be eliminated; (2) June 1999, when she

discovered that the store planned to hire two new assistant area sales managers and

recorded her suspicion of age discrimination; or (3) November 1999, when she

learned that her former position had been filled by a younger applicant.  Id. at

1263.

Without addressing whether Ms. Byrd had investigated the circumstances of

her replacement, we explained that the third option was the "only one consistent

with our precedent and the facts of [the] case."  Id. at 1268.  Thus, we held that the

ADEA's limitations period had been equitably tolled until November 1999: it was

only then that Ms. Byrd had "sufficient evidence to support her age discrimination

claim."  Id. at 1266.  We emphasized that even Ms. Byrd's June 1999 discovery

that the store planned to hire two new assistant area sales managers was

35

insufficient to trigger the limitations period because Ms. Byrd could not have been expected to act on "mere suspicion." Id. at 1267.

Jones controls here. If anything, Mr. Villarreal's case presents an even stronger argument for equitable tolling because unlike Ms. Byrd, Mr. Villarreal alleges that he could not have even suspected age discrimination until shortly before he filed his charge of discrimination. Specifically, although Mr. Villarreal applied for a Territory Manager position in November 2007, he alleges that neither the application itself nor any other information available to him described RJ Reynolds's hiring process, the resume review guidelines, or the statistical disparities in the ages of successful applicants. Indeed, because RJ Reynolds never contacted Mr. Villarreal about his application, all he could have known until April 2010 was that he applied for a Territory Manager position but was never offered the job.[15] These facts were simply insufficient to support his cause of action and trigger the limitations period.

Accepting Mr. Villarreal's allegations as true and drawing all inferences in

---

[15] The dissent overlooks this point entirely. The question here is not what a reasonably prudent person would have done, but whether the relevant facts would have "[become] apparent to a reasonably prudent person" any earlier than April 2010. Jones, 331 F.3d at 1267. Mr. Villarreal alleges that a reasonably prudent person could not have discovered RJ Reynolds's allegedly discriminatory practices until that time. This is a facially plausible claim, which is all that is required at this early stage. Chaparro v. Carnival Corp., 693 F.3d 1333, 1337 (11th Cir. 2012) (per curiam) (stating that, to survive a motion to dismiss, a complaint must "state a claim to relief that is plausible on its face" (quotation omitted)).

36

his favor—as we must, at this stage—we hold that Mr. Villarreal has stated a claim for equitable tolling.  We offer no view on whether he will ultimately be able to benefit from the doctrine.  The factual question remains whether a person such as Mr. Villarreal, with a reasonably prudent regard for his rights, could have learned the facts necessary to support his lawsuit earlier than April 2010.  See Reeb, 516 F.2d at 931.  We reverse the District Court's dismissal of Mr. Villarreal's pre-November 2009 disparate treatment claims as time-barred and remand for further proceedings.[16]

**REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.**

---

[16] Mr. Villarreal also argues that, in the alternative, his charge of discrimination was timely under the "continuing violation doctrine."  See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 110, 122 S. Ct. 2061, 2071 (2002).  Because we agree that he has stated a claim for equitable tolling, we need not reach this issue.

VINSON, District Judge, dissenting:

Although every case is important to the litigants involved, not every case is independently significant. But this one is, and it has the potential to create bad law in two important areas. The majority first holds—and it is the only court ever to do so—that Section 4(a)(2) of the ADEA authorizes disparate impact claims brought by job applicants. It gets there by finding that Section 4(a)(2) is ambiguous and that Mr. Villarreal's reading of the statute is reasonable, thereby warranting deference to the EEOC's longstanding position that it protects applicants for hire. The majority further holds—contrary to well established law—that such plaintiffs may be entitled to the "extraordinary remedy" of equitable tolling, notwithstanding the total absence of any plausible claim (let alone any evidence) of "extraordinary circumstances" to justify it. I strongly disagree on both points and must respectfully dissent.

I.

Section 4(a) of the ADEA makes it unlawful for an employer:

(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age; [or]

(2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age[.]

29 U.S.C. § 623(a)(1)-(2).  Based on its plain language, the statute clearly protects both employees and job applicants from disparate treatment in Section 4(a)(1), but it only protects <u>employees</u> in Section 4(a)(2).

In <u>Smith v. City of Jackson, Miss.</u>, 544 U.S. 228, 125 S. Ct. 1536 (2005), the Supreme Court noted this important distinction and held that the ADEA authorizes disparate impact claims pursuant to Section 4(a)(2).  Significantly, the entire Court recognized that disparate impact claims are not available under Section 4(a)(1) since that section is limited to disparate treatment, so disparate impact liability exists <u>only</u> under Section 4(a)(2).  <u>See</u> <u>id.</u> at 236 n.6, 125 S. Ct. at 1542 n.6 (plurality); <u>accord</u> <u>id.</u> at 243, 125 S. Ct. at 1546 (agreeing with the plurality) (Scalia, J., concurring).

The plaintiffs in <u>Smith</u> were existing employees.  The question presented in this case is whether job applicants can pursue disparate impact claims under Section 4(a)(2).  The majority holds that they can, but this is contrary to the plain language of Section 4(a)(2) (which, as indicated above, clearly only protects employees); and, as will be seen <u>infra</u>, it is contrary to every other court that has considered this issue, including the opinions of eight Supreme Court Justices in <u>Smith</u>.[1]

---

[1]  Chief Justice Rehnquist took no part in the <u>Smith</u> decision.

Two "key textual differences" between Section 4(a)(1) and (a)(2) make clear that the majority is wrong.  Cf. id. at 236 n.6, 125 S. Ct. at 1542 n.6 (noting that the differences between the two paragraphs are important in determining the availability of disparate impact claims).  First of all, while Section 4(a)(1) broadly prohibits discrimination against "any individual," Section 4(a)(2) is much more limited.  It only prohibits the employer from "limit[ing], segregat[ing], or classify[ing] his employees" in any manner that adversely affects them based on age.  (Emphasis added.)  The phrase "his employees," including the use of the possessive "his," is critically important as it limits the scope of Section 4(a)(2) to those actions that an employer takes against employees.  This limiting phrase is clear and unambiguous.  A job applicant is, by definition, not an employee.[2]

Second, unlike Section 4(a)(1), which prohibits an employer from "fail[ing] or refus[ing] to hire" a person based on age, Section 4(a)(2) makes no reference to hiring decisions at all.  In other words, Congress expressly included job applicants within the protections of the first paragraph of Section 4(a) (the disparate treatment provision), but it then omitted them in the very next paragraph (the disparate impact provision).  As the Supreme Court has frequently said (and as the majority itself has recognized): "Congress generally acts intentionally when it uses

---

[2]  The ADEA defines employee as "an individual employed by any employer[.]"  See 29 U.S.C. § 630(f).

40

particular language in one section of a statute but omits it in another." Department of Homeland Sec. v. MacLean, __ U.S. __, __, 135 S. Ct. 913, 919 (2015); see also National Federation of Independent Business v. Sebelius, __ U.S. __, __, 132 S. Ct. 2566, 2583 (2012) ("Where Congress uses certain language in one part of a statute and different language in another, it is generally presumed that Congress acts intentionally."). This is particularly so where, as here, the two statutory provisions are right next to each other. See, e.g., MacLean, 135 S. Ct. at 919 ("The interpretative canon that Congress acts intentionally when it omits language included elsewhere applies with particular force . . . [where the omitted phrase is used] in close proximity."); see also Russello v. United States, 464 U.S. 16, 23, 104 S. Ct. 296, 300 (1983) (stating that if Congress intended a particular statutory result, "it presumably would have done so expressly as it did in the immediately [preceding] subsection . . . . We refrain from concluding that the differing language in the two subsections has the same [reach]").

In arguing that Section 4(a)(2) protects job applicants, Mr. Villarreal points to the language in the paragraph that, he claims, prevents employers from "depriv[ing] any individual of employment opportunities[.]" (Emphasis added.) The majority, favoring only one portion of the sentence and disregarding the rest of that sentence, believes this argument is reasonable because "any" is a broad and powerful word, and "individual" is not limited to employees. I suppose that

41

clause, if read out of context, could "reasonably" support Mr. Villarreal's position because an applicant who was not hired is an "individual" who has been "deprive[d] . . . of employment opportunities."  But, as this court has said in statutory construction cases, "context means a lot."  Friends of the Everglades v. South Florida Water Mgmt. District, 570 F.3d 1210, 1221 (11th Cir. 2009).  Here, context simply means that a single clause means what it says.  Section 4(a)(2) does not use the word "individual" in isolation, but, instead, it clearly protects only "individual[s]" whose "status as an employee" was adversely affected by an employer's "limit[ing], segregat[ing], or classify[ing] his employees."  (Emphasis added.)  Thus, in the context of Section 4(a)(2), the "individuals" authorized to file suit are limited to actual "employees," rather than people who have no employment relationship with the employer at all.

The majority devotes most of its opinion to several additional extra-statutory arguments that Mr. Villarreal and RJ Reynolds have raised, ultimately concluding that the arguments cut both ways, which renders the statute ambiguous and justifies deference to the EEOC's longstanding view on this issue.  That is all unnecessary.  Because the language of Section 4(a)(2) is plain and clear on its face—particularly when contrasted with the language of Section 4(a)(1)—that should end the inquiry.  See King v. Burwell, __ U.S. __, __, 135 S. Ct. 2480, 2489 (2015).  And that means we should not (and cannot) defer to the EEOC's interpretation of Section

4(a)(2), no matter how long it has held that position. See Public Employee Retirement System of Ohio v. Betts, 492 U.S. 158, 171, 109 S. Ct. 2854, 2863 (1989) ("[O]f course, no deference is due to agency interpretations at odds with the plain language of the statute itself. Even contemporaneous and longstanding agency interpretations must fall to the extent they conflict with statutory language.").[3] Deference to an agency's interpretation of a statute is proper "only when the devices of judicial construction have been tried and found to yield no clear sense of congressional intent." See, e.g., General Dynamics Land Systems v. Cline, 540 U.S. 581, 600, 124 S. Ct. 1236, 1248 (2004). Stated another way, when "regular interpretive method leaves no serious question" about how a statute should be read, looking to an agency's interpretation is inappropriate. See id. Here, "regular interpretive method"—indeed, just reading both paragraphs of Section 4(a)—"leaves no serious question" that Section 4(a)(2) does not apply to job applicants.

I am not alone in holding this view, as three of our sister circuits have stated

---

[3] The EEOC has been wrong many times before. Betts is one of several cases that RJ Reynolds has cited where courts have rejected the agency's flawed reading of the ADEA. See, e.g., Kentucky Retirement Systems v. EEOC, 554 U.S. 135, 149-50, 128 S. Ct. 2361, 2371 (2008) (refusing to defer to EEOC's unpersuasive interpretation of the ADEA); General Dynamics Land Systems v. Cline, 540 U.S. 581, 600, 124 S. Ct. 1236, 1248 (2004) (deference to EEOC's reading of the ADEA unwarranted "because the Commission is clearly wrong"); Shikles v. Sprint/United Mgmt. Co., 426 F.3d 1304, 1316 (10th Cir. 2005) (rejecting EEOC's position because it was "not particularly persuasive" and "directly contrary" to numerous other authorities).

that Section 4(a)(2) is limited to employees.  Smith v. City of Des Moines, 99 F.3d 1466, 1470 n.2 (8th Cir. 1996) (recognizing that Section 4(a)(2) "governs employer conduct with respect to 'employees' only"); Ellis v. United Airlines, Inc., 73 F.3d 999, 1007 n.12 (10th Cir. 1996) ("We do not dwell on [Section 4(a)(2)] because it does not appear to address refusals to hire at all . . . ."), overruled on other grounds by Smith, 544 U.S. at 228, 125 S. Ct. at 1536; EEOC v. Francis W. Parker School, 41 F.3d 1073, 1077-78 (7th Cir. 1994) (the conclusion that Section 4(a)(2) does not apply to "'applicants for employment' . . . is a result dictated by the statute itself"), overruled on other grounds by Smith, 544 U.S. at 228, 125 S. Ct. at 1536.  Villarreal concedes these "contrary circuit decisions," but he asserts that they were addressing Section 4(a)(2) "only in dicta."  That may be true. Nevertheless, these opinions indicate that three Courts of Appeal read Section 4(a)(2) to exclude job applicants, which is "a result dictated by the statute itself." See Francis W. Parker School, 41 F.3d at 1078.  And, that's not all.

In her concurring opinion in Smith, Justice O'Connor (who was joined by Justice Kennedy and Justice Thomas) could not have been any clearer on this issue: "Section 4(a)(2), of course, does not apply to 'applicants for employment' at all—it is only § 4(a)(1) that protects this group."  See Smith, 544 U.S. at 266, 125

44

S. Ct. at 1559 (O'Connor, J., concurring) (emphasis added).[4]  While Justice

O'Connor was only writing for three Justices, it is notable that nobody disagreed

with her.[5]  In fact, rather than dispute her confident declaration that "of course"

Section 4(a)(2) does not protect job applicants, Justice Scalia wrote that the

EEOC's "attempt to sweep employment applications into the disparate-impact

prohibition [may be] mistaken," id. at 246 n.3, 125 S. Ct. at 1548 n.3 (Scalia, J.,

concurring), while the four-Justice plurality stated (and Justice Scalia "agree[d]")

that Section 4(a)(2) "focuses on the effects . . . on the employee," and courts must

recognize "key" differences between Section 4(a)(1) and (a)(2):

> Paragraph (a)(1) makes it unlawful for an employer "to
> fail or refuse to hire . . . any individual . . . because of
> such individual's age."  (Emphasis added.)  The focus of
> the paragraph is on the employer's actions with respect to
> the targeted individual.  Paragraph (a)(2), however,
> makes it unlawful for an employer "to limit . . . his
> employees in any way which would deprive or tend to
> deprive any individual of employment opportunities or

---

[4]  The only source that Justice O'Connor cited for this pronouncement was Section 4(a) itself, strengthening the conclusion that it is compelled by a plain reading of the statute.

[5]  If, for example, Griggs v. Duke Power Co., 401 U.S. 424, 91 S. Ct. 849 (1971) must be read the way that Mr. Villarreal reads it (which the majority says is reasonable), it seems likely that someone would have at least mentioned it in response to Justice O'Connor's statement. After all, the Justices repeatedly voiced their disagreements with multiple other parts of her opinion. See Smith, 544 U.S. at 236 ns.6-7, 238-239, 125 S. Ct. at 1542 ns.6-7, 1543-44 (e.g., Justice O'Connor "ignores" parts of the statute; "her textual reasoning is not persuasive;" and she is "quite wrong") (plurality); accord id. at 245-47 & ns.2-3, 125 S. Ct. at 1547-49 & ns. 2-3 (e.g., Justice O'Connor's various arguments are "misguided," unsupported by authority, "cannot be squared," "make[ ] little sense," and "cannot possibly be [right]") (Scalia, J., concurring).

45

> otherwise adversely affect his status <u>as an employee</u>, because of such individual's age." (Emphasis added.) Unlike in paragraph (a)(1), there is thus an incongruity between the employer's actions—which are focused on his <u>employees</u> generally—and the <u>individual employee</u> who adversely suffers because of those actions. Thus, an employer who classifies his <u>employees</u> without respect to age may still be liable under the terms of this paragraph [Section 4(a)(2)] if such classification adversely affects the <u>employee</u> because of that <u>employee's</u> age—the very definition of disparate impact.

<u>Id.</u> at 236 & n.6, 125 S. Ct. at 1542 & n.6 (some emphasis altered). In other words, the four-Justice plurality, Justice Scalia, and Justice O'Connor (along with Justices Kennedy and Thomas, who concurred with her) treated Section 4(a)(2) as limited to employees —which is exactly what the statute says—and Justice Scalia separately recognized that it might be a "mistake[ ]" to conclude otherwise.

The majority does not persuasively dispute this reading of <u>Smith</u>. Rather, because <u>Smith</u> involved current employees, it dismisses the language as dicta, just as Mr. Villarreal has sought to avoid inconvenient language directly on point from the Seventh, Eighth, and Tenth Circuits. But together, that's a lot of dictum to ignore. Furthermore, "there is dicta and then there is dicta, and then there is Supreme Court dicta." <u>Schwab v. Crosby</u>, 451 F.3d 1308, 1325 (11th Cir. 2006). This circuit has warned that "dicta from the Supreme Court is not something to be lightly cast aside," especially if it is "'expressed so unequivocally'" and there is no

46

"'clear'" case law to the contrary.  See id. at 1325-26 (citing multiple cases).  Not only is there no clear case law to the contrary—by any court, anywhere—but at least two District Courts have read Smith's "dicta" to be unequivocal and preclude disparate impact claims by job applicants.  See Mays v. BNSF Railway Co., 974 F. Supp. 2d 1166, 1175-77 (N.D. Ill. 2013) (observing that because "both the plurality and Justice O'Connor's concurrence described [Section 4(a)(2)] as protecting the employer's employees, period . . . the best and likely only possible way to read the provision" is that it must be limited to "an 'employee' of the employer"); see also EEOC v. Allstate Ins. Co., 458 F. Supp. 2d 980, 989 (E.D. Mo. 2008) ("a disparate impact hiring case . . . is no longer cognizable after [Smith]"), aff'd 528 F.3d 1042 (8th Cir. 2008), reh'g en banc granted and opinion vacated and appeal dismissed for lack of jurisdiction (Sept. 8, 2008)).[6]

In sum, the statute is plain and unambiguous.  Consistent with two District Courts, three Courts of Appeal, and eight Supreme Court Justices (the full Court that considered the Smith case): "Section 4(a)(2), of course, does not apply to 'applicants for employment' at all—it is only § 4(a)(1) that protects this group."  Smith, 544 U.S. at 266, 125 S. Ct. at 1559 (O'Connor, J., concurring).  The

---

    [6] Moreover, to the extent that all the cases I have cited on this issue may involve dicta, that only helps prove the point.  If the issue was not expressly raised and argued in these cases (or in any other case), perhaps that is because, until this case, no plaintiff had ever tried to argue that Section 4(a)(2) applies to job applicants.  And, until today, no court had ever suggested the statute could be read that way.

majority is wrong to hold otherwise.[7]

## II.

Now to the second issue raised on appeal: equitable tolling.  I will start by discussing the high standard that a plaintiff must satisfy before tolling is allowed.

The general federal rule is that a statute of limitations begins to run when the facts that would support a cause of action are apparent "'or should be apparent to a person with a reasonably prudent regard for his rights.'"  Rozar v. Mullis, 85 F.3d 556, 561-62 (11th Cir. 1996) (citations omitted).  For employment discrimination claims, "a cause of action accrues whenever an individual is directly and adversely affected by the discriminatory practices of the defendant."  United States v. Georgia Power Co., 474 F.2d 906, 924 (5th Cir. 1973).[8]  Triggering "events"

---

[7] The majority ignores the two District Courts and dismisses the three Courts of Appeal. It also discounts the significance of the plurality opinion and Justice Scalia's concurrence in Smith.  Although the opinions of the eight Supreme Court Justices with respect to Section 4(a)(2) and job applicants versus employees may be dicta, it is equally possible that it was integral to the Court's analysis.  At the very least, three Justices (O'Connor, Kennedy, and Thomas) unequivocally and emphatically stated that Section 4(a)(2) does not apply to job applicants, and the other five Justices impliedly agreed.  This "dicta" might not be compelling if there was persuasive case law to the contrary, but no court has ever suggested otherwise in the almost fifty years since the ADEA was enacted.  While the majority points out that this undisputed and directly-on-point dicta is not part of "three long, citation-laden paragraphs" of "well thought out, thoroughly reasoned, and carefully articulated analysis," that is not surprising.  Indeed, because the three Justices (and arguably the whole Court) believed Section 4(a)(2) to be so clear and unambiguous that "of course" it does not apply to job applicants, a lengthy and detailed analysis was unnecessary.

[8] In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc), this circuit adopted as binding precedent all Fifth Circuit decisions that were rendered before October 1, 1981.

include "the refusal to hire the discriminatee[.]"  Id.; accord, e.g., Hulsey v. Kmart, 43 F.3d 555, 558-59 (10th Cir. 1994) ("[N]otice or knowledge of discriminatory motivation is not a prerequisite for a cause of action to accrue under the ADEA. On the contrary, it is knowledge of the adverse employment decision itself that triggers the running of the statute of limitations.").  Consequently, the statute of limitations began running for Mr. Villarreal's claim when he was not hired in November 2007.  That means his EEOC charge in May 2010 was untimely— unless he is entitled to equitable tolling.

A limitations period can be equitably tolled if the party seeking it establishes that he was prevented from filing sooner because of events "that are both beyond his control and unavoidable even with diligence," as numerous panels of this court have expressed it.  See Motta ex rel. A.M. v. United States, 717 F.3d 840, 846 (11th Cir. 2013); Brotherhood of Locomotive Eng'rs & Trainmen Gen. Comm. of Adjustment CSX Transp. N. Lines v. CSX Transp., Inc., 522 F.3d 1190, 1197 (11th Cir. 2008); Arce v. Garcia, 434 F.3d 1254, 1261 (11th Cir. 2006); accord Drew v. Department of Corrections, 297 F.3d 1278, 1286 & 1290 n.5 (11th Cir. 2002) (noting same while tracing the origins of equitable tolling from its roots in English courts of chancery, and describing the "longstanding, firmly rooted principle that a court cannot grant equitable tolling unless it is satisfied that the party seeking such relief has acted with diligence").  In employment cases, courts

49

have said that the diligence requirement "imposes an affirmative duty on the potential plaintiff to proceed with a reasonable investigation in response to an adverse event." See Pacheco v. Rice, 966 F.2d 904, 907 (5th Cir. 1992); cf. Hulsey v. Kmart, 43 F.3d at 558 (refusing to toll statute of limitations period because plaintiff had a "duty to determine whether there was, in fact, a discriminatory motivation" for the adverse job action). Notably, "[i]t bears emphasizing . . . that due diligence on the part of the plaintiff, though necessary, is not sufficient to prevail on the issue of equitable tolling. The Supreme Court has made clear that tolling is an extraordinary remedy which should be extended only sparingly." Justice v. United States, 6 F.3d 1474, 1479 (11th Cir. 1993) (citing Irwin v. Department of Veterans Affairs, 498 U.S. 89, 96, 111 S. Ct. 453, 457-58 (1990)). This court has stated the same in the ADEA context: "Equitable tolling is inappropriate when a plaintiff did not file an action promptly or failed to act with due diligence. Equitable tolling 'is an extraordinary remedy which should be extended only sparingly.'" See Bost v. Federal Express Corp., 372 F.3d 1233, 1242 (11th Cir. 2004) (citation omitted). A party seeking it must demonstrate "extraordinary circumstances." See Jackson v. Astrue, 506 F.3d 1349, 1353-55 (11th Cir. 2007) (citing, inter alia, Ross v. Buckeye Cellulose Corp., 980 F.2d 648 (11th Cir. 1993) (Title VII case)).

The majority says that extraordinary circumstances are not required in

50

ADEA cases.[9]  According to the majority, a less stringent standard applies in employment discrimination cases since discriminatory hiring practices are "unlikely to be readily apparent to the individual discriminated against."  Reeb v. Economic Opportunity Atlanta, Inc., 516 F.2d 924, 931 (5th Cir. 1975).  In advancing this argument, the majority notes that Jackson, supra, is a Social Security Act case, and it is "unaware of any ADEA case that imposes [the 'extraordinary circumstances'] requirement."  Jackson is indeed a Social Security Act case.  But, as indicated above, it expressly relies on Ross, which is a Title VII case that required a showing of "extraordinary circumstances."  See Jackson, 506 F.3d at 1353-55 (concluding that "a finding of extraordinary circumstances is necessary before a court may equitably toll the SSA's statutory period," which, the panel went on to observe, "is fully consistent with [this circuit's] approach to equitable tolling in" employment discrimination cases such as Ross).  Consequently, to be entitled to equitable tolling—even in the employment discrimination context—it appears to be well established that this court does, in

---

[9]  Even if one assumes that "extraordinary circumstances" are not required in ADEA cases (and, as will be seen in a moment, that is simply not correct), the precedent I just cited in the text makes it clear that equitable tolling—even in ADEA cases—is at the very least "'an extraordinary remedy which should be extended only sparingly.'"  See Bost, 372 F.3d at 1242 (ADEA case).

fact, require plaintiffs to show "extraordinary circumstances."[10]

If evaluated under the proper standard, it is clear that equitable tolling is not justified in this case. As previously noted, equitable tolling is only appropriate if a plaintiff untimely files due to extraordinary circumstances that are both beyond his control and unavoidable with due diligence. Mr. Villarreal does not even claim that there are any extraordinary circumstances in this case (like fraud, misinformation, or deliberate concealment by RJ Reynolds) that should warrant this extraordinary and sparingly-used remedy.[11]

Mr. Villarreal was given an opportunity by the District Court to set out his equitable grounds for tolling. According to his proposed amended complaint, after

---

[10] In addition to the published authority cited above, this circuit has repeatedly required "extraordinary circumstances" in Title VII and ADEA cases in unpublished decisions. See, e.g., Mesidor v. Waste Mgmt., Inc. of Florida, 606 F. App'x 934, 936 (11th Cir. 2015) (stating in Title VII case: "To show they are entitled to equitable tolling, the Appellants must show extraordinary circumstances such as fraud, misinformation, or deliberate concealment."); Bourne v. School Bd. of Broward County, 508 F. App'x 907, 909-10 (11th Cir. 2013) (same in Title VII case); Brown v. John Deere Product, Inc., 460 F. App'x 908, 909-10 (11th Cir. 2012) (same in Title VII case); Arrington v. United Parcel Service, 384 F. App'x. 851, 852 (11th Cir. 2010) (same in ADEA case); Wakefield v. Cordis Corp., 211 F. App'x 834, 836 (11th Cir. 2006) (same in Title VII case). This acknowledgment of the "extraordinary circumstances" requirement in so many unpublished cases is an implicit agreement that it is the settled law of this circuit.

[11] To be clear, I have cited employer fraud, misinformation, and deliberate concealment for illustrative purposes; I am not suggesting they are required. In fact, I agree with the majority that they are not. However, as will be seen shortly, this circuit has long been reluctant to—and usually does not—allow equitable tolling in the absence of such evidence. See, e.g., Cabello v. Fernandez-Larios, 402 F.3d 1148, 1554-55 (11th Cir. 2005) (observing that equitable tolling "'is reserved for extraordinary facts,'" and, before it can be authorized, "'courts usually require some affirmative misconduct, such as deliberate concealment'") (citation omitted); see also Cocke v. Merrill Lynch & Co. Inc., 817 F.2d 1559, 1561 (11th Cir. 1987) (recognizing that "'courts evince a reluctance to toll the filing period absent misconduct or bad faith attributable to the defendant'") (citation omitted).

he was denied employment with RJ Reynolds in November 2007, he did nothing

for more than two years.  In fact, he did not even call the company to confirm that

his application had been reviewed, let alone find out why it was rejected.  He made

no attempt to discover the identity or age of the person who was hired, nor did he

try to learn about the company's hiring practices or its allegedly discriminatory

"resume review guidelines."  To be sure, it might have been somewhat difficult for

him to have gotten such information since RJ Reynolds used third-party services to

screen its applicants, but the fact is that he made no attempt to try.  He did not

exercise any diligence at all, and a reasonably prudent person with concern for his

rights would have done so.

The majority believes that such efforts should not be required of plaintiffs in

failure-to-hire cases because any investigation into why they were not hired would

be "an entirely futile" gesture insofar as "[a] disappointed applicant inquiring of an

employer about the age and identity of whoever was hired in his stead will likely

not be well received.  Indeed, employers have every incentive to hold this type of

information close."  But, the same could be said of almost every case.  Potential

defendants in virtually every litigation have an incentive to withhold information

that might subject them to liability.  Yet, we always require plaintiffs to exercise

diligence before they are entitled to equitable tolling; and as previously noted, the

remedy is so rare that it could still be denied even if the plaintiff did exercise due

53

diligence.  Justice, 6 F.3d at 1479.

Whatever specific form "due diligence" could have taken on the facts of this case (whether personal investigation or something else), if the diligence requirement means anything at all, Mr. Villarreal must have at least done something.  See id.; Pacheco, 966 F.2d at 907; cf. Drew, 297 F.3d at 1290 n.5 (recognizing that equitable tolling is a remedy "that has always been reserved only for parties who have pursued their rights diligently and whose untimeliness is due to factors entirely beyond their control;" consequently, a party seeking relief cannot have "'slept on his rights'" and done "'nothing for several years'") (emphasis in original) (collecting cases).  The record here is unchallenged that Mr. Villarreal did nothing until about two and a half years after his application was rejected, when he was first contacted by the attorneys investigating a possible class action suit against RJ Reynolds.  As far as I can tell, neither this circuit nor any other court has ever tolled a statute of limitations in order to accommodate lawyers putting together a cause of action, and allowing tolling in such a situation effectively eviscerates the statute of limitations.  Villarreal has not shown (or even alleged) that there was anything "extraordinary" which prevented him from investigating his claim (with or without an attorney) and then pursuing his rights within the limitations period.  To follow the necessary logic of his argument, any plaintiff (in any type of lawsuit) who claims to have required the assistance of an

54

attorney to discover the existence of a claim—even those plaintiffs, like Villarreal, who conduct absolutely no diligence at all—may be entitled to equitable tolling for an indefinite period of time.[12]

It is telling that every case the majority has relied upon (save one) involved misrepresentations and/or concealment by employer defendants.[13]  Although I have agreed that equitable tolling does not necessarily require active misrepresentation or concealment by the employer [supra note 11], each of the cases cited by the majority precisely involved misrepresentation or concealment.  See, e.g., Jones v. Dillard's, Inc., 331 F.3d 1259 (11th Cir. 2003) (employer fired plaintiff after claiming that her position was being eliminated, but she discovered more than 180 days later that the job had been filled with a younger person); Sturniolo v.

---

[12]  The majority tries to cabin its ruling to employment discrimination claims (particularly failure-to-hire claims).  It maintains that the law it announces today makes "good sense" because job applicants "may not know any relevant facts at the time of the discriminatory act."  However, even if that is true "at the time," that does not excuse them from acting with diligence (as required by circuit precedent) and making an effort to learn the "relevant facts" thereafter.  To the extent the majority believes, as previously noted, that it would be "futile" for a plaintiff to conduct such an inquiry because a defendant would have "every incentive" to withhold evidence relating to his misdeeds, the logic of that view would not only apply to discrimination statutes, but could apply to virtually any civil action.

[13]  And, the one case that did not involve any misconduct by the employer, Browning v. AT&T Paradyne, 120 F.3d 222 (11th Cir. 1997), does not help Mr. Villarreal.  While that case did not have employer misconduct, it did involve the EEOC advising the plaintiff that his claim was governed by an incorrect statute of limitations, after which he filed a claim that was untimely by 18 days.  This circuit concluded: "On this unique, specific set of facts, we hold, and our holding is a very narrow one, that the statute of limitations was tolled for the 18 days that Hanna's complaint was untimely."  Id. at 227 (emphasis added).  By contrast, there are no allegations of misconduct or misinformation in this case (by either the company or the EEOC) that prevented Mr. Villarreal from filing timely.

Sheaffer, Eaton, Inc., 15 F.3d 1023 (11th Cir. 1994) (same); Cocke v. Merrill

Lynch & Co., Inc., 817 F.2d 1559 (11th Cir. 1987) (employer told plaintiff that he

was going to be terminated on a date certain, but that the company would continue

to look for a position for him in the meantime; holding that tolling was appropriate

as "[i]t is too much for the law to expect an employee to sue his employer for age

discrimination at the same time he is led to believe the employer is trying to place

him in another job").  Importantly, all of these cases are rooted in Reeb, supra,

where a female employee was falsely told that her job was not being renewed due

to limited funds, after which she discovered (once the time to file with the EEOC

had passed) that her position had actually been filled by a less qualified male.  The

defendant company, in other words, "actively sought to mislead" her.  Reeb, 516

F.2d at 930.

The common denominator in every one of these cases is that the employers

misrepresented or concealed information, and the plaintiffs were put in a situation

where they confronted "two equally unattractive options": file a claim when there

was at most "a mere suspicion," in which case the litigation would be considered

premature and would probably fail; or wait for "the surfacing of telltale evidence,"

i.e., the hiring of a younger individual, in which case "the cunning employer will

escape liability by postponing the hiring of a replacement for at least six months."

See Jones, 331 F.3d at 1264.  As this court has noted, the point of Reeb was simply

56

to "close the loophole" that was being used by such "malicious employers" to avoid liability.  Jones, 331 F.3d at 1264-65.  Or, as the former Fifth Circuit described it: "The rationale underlying [Reeb] is that it is unfair to allow a defendant to conceal facts that support the plaintiff's cause of action and then to rely on the statute of limitations to bar the suit when a duly diligent plaintiff was unable to discover those facts."  Chappell v. Emco Mach. Works, 601 F.2d 1295, 1303 (5th Cir. 1979).  The majority's reliance on Reeb and its progeny is misplaced on the facts presented here.

It makes sense to apply equitable tolling in the sort of cases described above since it would be inequitable to allow an employer to take advantage of a statute of limitations by misrepresenting or fraudulently concealing information that could have put the employee on notice that his rights might have been violated.  As the Reeb court stated, "a party responsible for such wrongful concealment [should be] estopped from asserting the statute of limitations as a defense . . . [as] 'no man may take advantage of his own wrong.'"  See Reeb, 516 F.2d at 930 (citation omitted).  However, it makes absolutely no sense to apply tolling in a situation like the one here, where there was no misconduct by RJ Reynolds that in any way contributed to Mr. Villarreal's late filing.  Unlike every one of the cases cited by the majority, the company did not conceal facts, erect any barriers, or take advantage of a "loophole" to keep him from filing timely.  Nor was he misled about the applicable

57

statute of limitations.  See supra note 13.  Mr. Villarreal just did nothing—not even

make a phone call to see that his resume had been reviewed—for approximately

two and a half years.  To the extent the majority believes that equitable tolling is

available in cases like this one simply because people who are discriminated

against in hiring do not have sufficient information to know they were victims of

discrimination, that is hardly an unusual or extraordinary circumstance.  As RJ

Reynolds has pointed out:

> Accepting Villarreal's argument would mean that the
> limitations period in most every hiring case could be
> tolled indefinitely, or at least until the plaintiff was
> contacted by an attorney looking for clients to build a
> class action.  Equitable tolling would no longer be an
> "extraordinary remedy"—it would become the norm.
> That is not and should not be the law.

There are obvious reasons why today's ruling "should not be the law," including

some identified by the Seventh Circuit:

> Statutes of limitations are not arbitrary obstacles to the
> vindication of just claims, and therefore they should not
> be given a grudging application.  They protect important
> social interests in certainty, accuracy, and repose.  The
> statute of limitations is short in age discrimination cases
> as in most employment cases because delay in the
> bringing of suit runs up the employer's potential liability;
> every day is one more day of backpay entitlements.  We
> should not trivialize the statute of limitations by
> promiscuous application of tolling doctrines.

58

Cada v. Baxter Healthcare Corp., 920 F.2d 446, 452-53 (7th Cir. 1990) (Posner, J.).

I recognize that the majority is not necessarily saying that Mr. Villarreal will be entitled to equitable tolling. Rather, it is saying that, at the motion to dismiss stage, he has adequately pled the applicability of the doctrine. He has not. Under Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955 (2007), and Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937 (2009), Mr. Villarreal must allege sufficient facts, taken as true, that state a "plausible" claim for equitable tolling. Although he makes a boilerplate allegation in his amended complaint that a reasonably prudent person in his position would not have suspected the company's discriminatory hiring practices until he was contacted by the lawyers, that is not enough. See, e.g., Iqbal, 556 U.S. at 678 ("A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'") (quoting Twombly). Villarreal alleges no facts suggesting that there was anything "extraordinary" here. There is nothing about this case that is particularly unique or different than any other failure-to-hire case. The District Court gave Villarreal an opportunity to meet the Twombly and Iqbal standard, but he was not able to do so. In fact, rather than setting forth a plausible claim for equitable tolling, the amended complaint conclusively establishes that

59

tolling is not appropriate.  It bears repeating once more that the amended complaint makes clear that Villarreal not only failed to conduct any inquiry into why he was not hired, but it expressly states that he did not even contact RJ Reynolds to see "whether his application had been reviewed at all."  It is, quite frankly, hard to imagine a plaintiff acting with less diligence and prudent regard for his rights.[14]

## III.

For the reasons stated above, I believe the District Court should be affirmed. I must respectfully dissent.

---

[14]  Because the majority accepted Mr. Villarreal's equitable tolling argument, it found it unnecessary to reach his alternative argument pursuant to the "continuing violation doctrine."  I will not do so either.